UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA CIVIL LIBERTIES UNION FOUNDATION. INC. doing business as AMERICAN CIVIL LIBERTIES UNION OF INDIANA, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | 1:15-cv-01356-SEB-DML |
| vs. | ) ) | |
| INDIANA SECRETARY OF STATE, MEMBERS OF THE INDIANA ELECTION COMMISSION, SUPERINTENDENT OF THE INDIANA STATE POLICE, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the court on Plaintiff Indiana Civil Liberties Union Foundation, Inc., d/b/a American Civil Liberties Union of Indiana's ("ACLU") Motion for Summary Judgment [Docket No. 35] and Defendants Indiana Secretary of State, The Members of the Indiana Election Commission, and the Superintendent of the Indiana State Police's (collectively "the State") Cross Motion for Summary Judgment [Docket No. 38]. For the reasons detailed herein, Plaintiff's motion is <u>GRANTED</u> and Defendants' cross motion is <u>DENIED</u>.

1

**Factual and Procedural Background**

On July 1, 2015, Indiana Code § 3-11-8-17.5 went into effect, providing:

(a) Voters may use cellular telephones or other electronic devices in the polls as long as electioneering or loud or disruptive conversations do not occur.

(b) A voter may not do the following:

(1) Take a digital image or photograph of the voter's ballot while the voter is in a polling place, an office of the circuit court clerk (under IC 3-11-10-26), a satellite office established under IC 3-11-10-26.3, or a vote center established under IC 3-11-18.1-4, except to document and report to a precinct officer, the county election board, or the election division a problem with the functioning of the voting system.

(2) Distribute or share the image described in subdivision (1) using social media or by any other means.

Ind. Code § 3-11-8-17.5.

On August 27, 2015, the ACLU invoked associational standing in filing suit on behalf of its members who have taken photographs of their election ballots in the past or intend to do so in future elections, alleging that Ind. Code § 3-11-8-17.5 violates the First Amendment of the United States Constitution. Dkt. 1, 17, 25. On September 4, 2015, the ACLU moved for a preliminary injunction seeking to enjoin application and enforcement of the law. Dkt. 8.

On October 19, 2015, we granted the ACLU's motion for preliminary injunction, concluding that Ind. Code § 3-11-8-17.5 embodies a content-based restriction on speech

that cannot survive strict scrutiny because it neither serves compelling state interests nor is it narrowly tailored to achieve those interests. Dkt. 32.

On April 11, 2016, the ACLU filed a motion for summary judgment requesting that our preliminary injunction become permanent. Dkt. 35. On May 12, 2016, the State responded with a cross motion for summary judgment essentially defending the state statute and opposing the injunction. See Dkt. 38. The parties' cross motions became fully briefed on June 21, 2016, and are now ripe for decision.

**Legal Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the evidence establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

3

material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Courts often confront cross motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D. Md. 1998). Here, the Court has considered the parties' respective memoranda and the exhibits attached thereto and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective nonmovant. *Matsushita,* 475 U.S. at 574. The parties before us, by filing cross motions, stipulate that there are no material facts in controversy and that their dispute is ripe for decision on summary judgment.

## Discussion[1]

In its cross motion for summary judgment, the State argues (1) that Indiana has constitutional authority to regulate elections and impose voting restrictions to maintain the integrity of the voting process; (2) that Ind. Code § 3-11-8-17.5 is content-neutral and therefore subject to a lesser level of scrutiny; and (3) that even if Ind. Code § 3-11-8-17.5 were subject to strict scrutiny, it would nevertheless survive such scrutiny because

---

[1] Due to the nature of the parties' arguments and in light of our October 19, 2015 Order on the issues presented by this case, we focus primarily on the State's cross motion for summary judgment, which, in essence, requests reconsideration of our prior ruling.

4

Indiana has a compelling interest in curtailing "voter misdeeds" and the statute is narrowly tailored to advance that interest. See Dkts. 38, 39.

The State's arguments are largely reflective of the issues discussed and decided in our prior order granting preliminary injunctive relief, Dkt. 32, though the State has focused its argument to urge that we approach the issues before us not as implicating fundamental free speech rights under the First Amendment, but instead as simply a voting restriction enacted pursuant to the State's broad authority pursuant to Art. I, § 4, cl. 1 of the United States Constitution. The State accordingly contends that it is not required to satisfy what it describes as the "absurd evidentiary requirement" of demonstrating the existence of voter fraud in Indiana to justify the statute. Instead, it maintains that, because the statute is simply a restriction on the voting process intended to uphold the integrity of the process, the State need not establish *any* specific purpose beyond that as a justification for the restriction. Def.'s Resp. at 11–13 (citing *Fed. Election Comm'n v. Nat'l Right to Work Comm'n*, 459 U.S. 197, 210 (1982)).

We are not convinced by the State's analysis or conclusion. Clearly, the United States Constitution grants "to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217 (1986). Yet, a simple reading of the plaint text of Ind. Code § 3-11-8-17.5 reveals that the statute places no regulation on the times, places, or manner of elections, instead restricting the taking and

sharing of certain photographs and digital images based on the content of those images. Thus, the State's general grant of regulatory powers to itself under Art. I § 4, cl.1 of the Constitution are not relevant to our analysis here. Ind. Code § 3-11-8-17.5 clearly implicates certain fundamental rights protected by the First Amendment. *See Reno v. ACLU*, 521 U.S. 844 (1997) (holding that the internet is a protected medium of communication under the First Amendment); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995) (holding that photographs are a protected medium of expression under the First Amendment); *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (holding that there is a right under the First Amendment to receive information and ideas); *ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) (affirming a right under the First Amendment to make audio and visual recordings). As the Supreme Court ruled in *Tashjian*, "The power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights." 479 U.S. at 217.

Accordingly, we shall proceed with our analysis in the same manner we previously followed in addressing the issues presented in this litigation, to wit, by determining first whether the restrictions are content based or content neutral, and then by determining whether they pass constitutional muster under the appropriate level of scrutiny. In conducting this analysis, we shall draw substantially on our October 19, 2015 Order, incorporating significant portions and modifying and/or elaborating on our analysis to the extent required to incorporate recent judicial decisions and fully developed

facts underlying the parties' respective summary judgment motions and supplemental briefing.

I. **Content-Based Restrictions**

The First Amendment prohibits states from restricting "expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Any law that effectively restricts expression (including the communication of such content) is analyzed in the context of two possible categories of restriction: content-based restrictions or content-neutral restrictions. Depending on whether the law is content based or content neutral, it invites a particular form and level of judicial scrutiny. Content-based restrictions are subject to strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*,—U.S. —, 135 S.Ct. 2218, 2231 (2015). Content-neutral restrictions are subject to intermediate scrutiny, which allows the Government to impose "reasonable restrictions on the time, place, or manner of protected speech" so long as the restrictions are "narrowly tailored to serve significant government interest, and [] leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Under either form of judicial scrutiny, the burden rests on the government to establish the importance of its interests and the narrow tailoring of its restrictions to conform to First Amendment standards.

Here, the State maintains that Ind. Code § 3-11-8-17.5 is content neutral "because all photography and posting to social media is banned *regardless of the content of the photo.*" Defs.' Br. at 14 (emphasis in original). But, as we addressed in our prior Order, this is simply untrue. Ind. Code § 3-11-8-17.5(b)(1) expressly provides that a voter may not "[t]ake a digital image or photograph *of the voter's ballot* while the voter is in the polling place." (emphasis added). A voter remains free, however, to take photographs of anything and everything other than her ballot while in the polling place. Ind. Code § 3-11-8-17.5(a). For example, a voter may take pictures of the que of voters waiting to enter the voting booths, of the voting booths themselves, of voters entering and exiting the booths; once inside a voting booth, she may take pictures of the interior walls, floors, curtains, indeed, any other aspect of her surroundings. A voter may even snap a "voting selfie" taken while in the act of voting so long as the image does not include a marked or unmarked ballot. Once a voter enters a polling place, she is free to take photographs or digital images with her smartphone (or camera) and to share them with whomever she pleases, in whatever way she pleases. Not until after her photographs are examined as to their content will the government know whether she has committed a felony under Ind. Code § 3-11-8-17.5. Indeed, it is this required post hoc examination of the photographs needed in order to enforce the terms of this statute which reveals its content-based nature. *Reed*, 135 S.Ct. at 2227.

Perhaps recognizing that only photographs of marked and unmarked ballots are prohibited by the law, the State argues in the alternative that the statute is nevertheless

8

content neutral because "[i]t applies equally to all ballots, whether marked or unmarked…As such, Ind. Code section 3-11-8-17.5 was clearly not enacted because of disagreement with any particular message or form of communication." Defs.' Br. at 16. This line of argument suffers from two deficiencies: First, while the statute purports to treat marked and unmarked ballots equally, it does not actually treat "all ballots" equally since it permits a voter to photograph her ballot, whether marked or unmarked, only if she does so in order to "document and report…a problem with the functioning of the voting system." Photographs taken of ballots for any other purpose are forbidden. Ind. Code § 3-11-8-17.5(b)(1). Photographs of ballots are thus treated differently under the statute based on their purpose—another hallmark of content-based regulation. Second, the statute's alleged equal application to all ballots, regardless of the candidate(s) for whom they have been marked (or if left unmarked), does not foreclose strict scrutiny. Government regulation of speech based on the specific motivating ideology or opinion of the speaker is, of course, a "more blatant [and] egregious form of content discrimination," but it is well established that speech regulation of a specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. *See Reed*, 135 S.Ct. at 2230 ("A law banning the use of sound trucks for political speech— and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed."); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980).

Regardless, the State's purpose-based justification for the statute puts the analytical cart before the horse. As the Supreme Court explained in *Reed,* it "skips the crucial first step in the content-neutrality analysis: determining whether the law is content based on its face." 135 S.Ct. at 2228. Courts are directed to consider whether a statute is content based on its face *before* turning to the legislature's purported justifications or purposes for enacting it. *Id.* (collecting cases). If the law is determined to be content based on its face, it is subject to strict scrutiny regardless of whether it was enacted with good intentions or benign motivations or out of an animus toward the ideas the speech contained. *Id.* "In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.*

Accordingly, having reviewed and carefully considered the parties' submissions, we arrive at the same conclusion we reached in our October 19, 2015 Order, namely, that Ind. Code § 3-11-8-17.5 is a content-based restriction subject to strict scrutiny.

### A. Strict Scrutiny

Having determined that Ind. Code § 3-11-8-17.5 is a content-based restriction, we next address whether the State has established that the restriction is necessary to further a "compelling interest" and is "narrowly tailored" to achieve that interest. *See e.g., Reed*, 135 S.Ct. at 2231(citing *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,—U.S.—, 131 S.Ct. 2806, 2817 (2011)).

#### 1. Compelling Interests

The State maintains, as it did at the preliminary injunction stage, that the Ind. Code § 3-11-8-17.5 serves three interrelated compelling interests: (1) preventing vote buying and selling; (2) maintaining the secrecy of the voter's ballots; and (3) maintaining the integrity of the electoral process. Defs.' Br. at 16–17.

As referenced in our prior Order, it is undisputed that these asserted interests are, in the abstract, compelling. *See Burson v. Freeman*, 504 U.S. 191, 199 (1992) ("[T]his Court has concluded that a State has a compelling interest in protecting voters from confusion and undue influence…[and] in preserving the integrity and reliability of the electoral process itself"). "To survive strict scrutiny, however, a State must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Id.* In other words, "[t]he state must specifically identify an 'actual problem' in need of solving." *Brown v. Entm't Merchs. Ass'n*, —U.S. —, 131 S.Ct. 2729, 2738 (2011) (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 822–23 (2000)); *see also Consol. Edison,* 447 U.S. at 543 ("Mere speculation of harm does not constitute a compelling interest.").

Though the State continues to assert that Indiana suffers from "specific voter issues" due to its "history of vote buying and selling," Defs.' Br. at 16, 18, it has repeatedly failed to sufficiently support its claim with any actual evidence of vote buying and selling. Since issuing our preliminary injunction, the State has had seven months—a span of time which included the 2015 election cycle and the 2016 primaries—to fully develop a factual record that would establish an ongoing problem of vote buying in

11

Indiana. Even with the benefit of this additional time and expanded opportunity to create a case, the State has come up with nothing that is in any way persuasive. In addition to the two newspaper articles, each dating back to the late 1980's which pertain to vote-buying indictments of certain county officials, and the 2008 email exchange containing a third-hand allegation of one Scottsburg, Indiana, voter placing his vote on eBay (on which evidence the State relied at the preliminary injunction stage), the State has identified only one new evidentiary item to support its assertion that Indiana suffers from systemic vote buying and selling such that a statutory protection is necessary to prevent the facilitation of the criminal conduct in the digital age. This single item of additional evidence is a June 17, 2013 article, published on FoxNews.com, reporting the guilty pleas of four Indiana Democratic Party officials for their roles in faking and forging signatures on pre-ballot petitions prior to the 2008 primaries. Defs.' Ex. 4. This publication has little persuasive effect in terms of changing our prior conclusion. Simply put, the State has failed to establish that Indiana suffers from any substantial ongoing vote-buying problem(s) in need of the statutory protections imposed by this statute, much less any problem(s) emanating from or pertaining to the use of digital photography in facilitating vote buying.

The State in fact concedes that "digital photography has yet to contribute to vote buying issues in Indiana," Defs.' Br. at 18, but nonetheless maintains that the broad restrictions and prohibitions imposed by Ind. Code § 3-11-8-17.5 are required to prevent the *potential* use of digital photography to facilitate vote buying in future election cycles.

As support for this argument, the State relies on a 2015 Pew Research Institute study which apparently found that 64% of Americans own/use a smartphone with camera and internet capabilities, and 67% of those Americans owning/using smartphones use them to share pictures, videos, or commentary about events happening in their community. See Defs.' Ex. 3-B. This evidence, however, properly considered, actually undermines the State's arguments. As the First Circuit recently noted, "Digital photography, the internet, and social media are not unknown quantities—they have been ubiquitous for several election cycles, without being shown to have the effect of furthering vote buying or voter intimidation." *Rideout v. Gardner*¸ 838 F.3d 65, 73 (1st Cir. 2016). The fact that a large percentage of Americans own and use smartphones to take and share digital images flies in the face of the State's inability to produce a single instance of their having been used to facilitate vote buying or voter coercion. Ind. Code § 3-11-8-17.5 is a solution in search of a problem. This leads inevitably to the conclusion that the statute does not withstand strict scrutiny. *Playboy*, 529 U.S. at 822.

### 2. Narrow Tailoring

Even if Indiana had been able to show that the State faces ongoing vote buying and selling problems facilitated by the electronic photographing and sharing of pictures of ballots, and even if Ind. Code § 3-11-8-17.5 were shown to have been enacted to prevent such future crimes, the statute would still fail to withstand strict scrutiny because it is not narrowly tailored to achieve that specific state interest. *See Reed*, 135 S.Ct. at 2231 (collecting cases). A law that restricts speech on the basis of its content imposes a

13

burden on the State to demonstrate that the restriction is the "least restrictive means" available to achieve the stated objective. *McCullen v. Coakley*,—U.S.—, 134 S.Ct. 2518, 2530 (2014); *Ashcroft v. ACLU,* 542 U.S. 656, 666 (2004).

Ind. Code § 3-11-8-17.5 fails to satisfy this standard because it extends far beyond the targeted speech in attempting to prevent vote buying. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 123 (1991). As previously explained, we fail to see how banning voters from taking photos of *unmarked* ballots in any way serves the statute's goal of protecting voters from vote buying and voter coercion. More particularly, even the prohibition on taking and sharing pictures of *marked* ballots draws into its ambit voters who may choose to take photos for entirely legitimate and legally innocuous reasons. Given the State's inability to identify a single instance in which digital photography facilitated vote buying or selling, despite the State's proffer that approximately two-thirds of Americans own and/or use a smartphone with a camera and approximately three-quarters of Americans participate in some type of social media website, this statute's propensity to ensnare large numbers of voters seeking to make a political point or to express pride in their voting by recording the moment or simply to capture the moment for some legally innocuous reason, far exceeds the State's otherwise legitimate goal of protecting voters from vote-buying predators.

The State has argued on summary judgment that in addition to vote buying and voter coercion, other activities, such as taking photographs of ballots in order to compile a scrapbook commemorating one's voting record and civic engagement, are likely

already illegal by virtue of other Indiana Code provisions, even if section 3-11-8-17.5 were found to be unconstitutional. See Defs.' Br. at 17. This is an odd argument because, if, as the State maintains, Indiana's voting regulations already make illegal certain vote-buying activities, including compiling photos of voters' ballots in a scrapbook, one wonders why the enactment of Ind. Code § 3-11-8-17.5 was necessary? [2]

The State's view appears to be that because voters are already barred by other regulations and statutes from displaying marked ballots to other persons in order to reveal their contents, this additional regulation barring Hoosiers from taking photographs or digital images of their marked or unmarked ballots has a *de minimis* constitutional effect. Defs.' Br. at 17.

This argument seriously mischaracterizes and undervalues the constitutional rights at issue in this case. The Supreme Court has recognized repeatedly that political speech "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). Moreover, "[t]he use of illustrations or pictures…serves important communicative functions to the [speaker's] message, and it may also serve to impart information directly." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 647 (1985). It is precisely for these reasons that fundamental free speech rights, unlike other constitutional rights, may be abridged only in service of a compelling state interest and only by the least restrictive alternative available.

---

[2] We note that the ACLU has vigorously protested the State's broad interpretation of Indiana's other voting regulations that might bar Hoosiers from compiling and sharing pictures of their ballots in a scrapbook. As those statutes are not before us here, we make no ruling on whether they would in fact bar such an activity.

The State acknowledges that Ind. Code § 3-11-8-17.5 could have been more narrowly drawn had the focus been on only those voters who take and share pictures of their marked ballots as part of a vote-buying scheme or offense. Nonetheless, it maintains that such a lesser restrictive alternative "would be much more difficult to enforce, as the enforcing entity would be required to seek further proof or evidence that the individual was photographing his or her ballot as part of a vote[-]buying scheme." Defs.' Br. at 20. Given the nature of the rights at issue, the statute will not pass muster if it contains a content-based restriction that shoots wide of the goal by targeting vast amounts of protected political speech in an effort to limit a relatively small subset of problematic speech, when other less restrictive alternatives exist. *See Ashcroft v. ACLU,* 542 U.S. at 666; *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) ("[W]e reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency.") (citation omitted).

Because the scope of Ind. Code § 3-11-8-17.5 covers significantly more speech than is necessary to accomplish its intended purpose and because less restrictive alternatives exist to address and deal with the State's concerns, the statute has not been narrowly tailored, and, as such, it fails to withstand strict scrutiny.

## B. Intermediate Scrutiny

For the reasons explained above, we conclude that Indiana Code § 3-11-8-17.5 is a content-based restriction on speech which fails to withstand strict scrutiny. We also note that, even if the statute had imposed a content-neutral restriction on speech, it would nevertheless be unconstitutional. Content-neutral restrictions must be "narrowly tailored to serve significant government interests, and [] leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

As the First Circuit explained in an analogous holding in *Rideout*, "intermediate scrutiny [like strict scrutiny] is not satisfied by the assertion of abstract interests. Broad prophylactic prohibitions that fail to 'respond precisely to the substantive problem which legitimately concerns' the State cannot withstand intermediate scrutiny." 838 F.3d at 73 (quoting *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984)). Given the lack of any compelling evidence that Indiana currently confronts problems involving vote buying, not to mention vote buying facilitated by electronic photography and the sharing of photos of election ballots, it is clear that Ind. Code § 3-11-8-17.5 fails to provide a solution to a real and *substantive* problem confronting the State. Accordingly, we hold that the statute does not withstand even intermediate scrutiny, given its failure to address or target significant state interests.

This is true because the statute also suffers from significant overreach. Even content-neutral restrictions are required to be narrowly tailored to fend off any untoward

attempts by government to suppress speech based on mere convenience. *See McCullen,* 134 S.Ct. at 2534. "Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." *Id.* at 2355 (citation omitted).

As previously noted, when a content-neutral restriction is challenged, the State bears the burden of showing that it does not restrict "substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. Unlike a content-based restriction, a content-neutral restriction need not be the "least restrictive or least intrusive" means of serving the government's interests, but the government still "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 798–99.

Here, the State has failed to establish that the potentially broad array of photographs and images proscribed by Ind. Code § 3-11-8-17.5 are necessarily related to or limited to those involved in vote buying and voter coercion. Thus, the burden imposed on speech by the restrictions contained in this statute will fall on voters who are engaged in legally innocuous activities. This statute clearly does not advance the State's asserted goals. At best, it provides an indiscriminate, blunt instrument to remedy a so-far undetected problem. As such, along with other defects, it fails to survive intermediate scrutiny for lack of narrow tailoring.

**Conclusion**

For the reasons detailed in this order, we hold that Ind. Code § 3-11-8-17.5 embodies a content-based restriction on speech that cannot survive strict or intermediate scrutiny because it neither serves compelling or significant state interests nor is it narrowly tailored to achieve those interests. Plaintiff ACLU's Motion for Summary Judgment [Docket No. 35] is therefore <u>GRANTED</u> and the State's Cross Motion for Summary Judgment [Docket No. 38] is <u>DENIED</u>. Final Judgment and Permanent Injunction of the enforcement of Indiana Code § 3-11-8-17.5 shall enter accordingly.

IT IS SO ORDERED.

Date: 1/19/2017

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Dennis E. Mullen
INDIANA ATTORNEY GENERAL
dennis.mullen@atg.in.gov

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

Nikki G. Ashmore
INDIANA ATTORNEY GENERAL
Nikki.Ashmore@atg.in.gov

Betsy M. Isenberg
OFFICE OF THE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov